# In the United States Court of Federal Claims

No. 13-365C
(Filed: July 28, 2014)

| | |
|---|---|
| UNITED STATES ENRICHMENT CORPORATION, <br><br>　　　　　Plaintiff, <br><br>v. <br><br>THE UNITED STATES, <br><br>　　　　　Defendant. | **Motion to Dismiss for Lack of Subject Matter Jurisdiction; Contract Disputes Act, 41 U.S.C. § 7103;  No Standing Claims Arising from Subcontracts** |

*Thomas A. Lemmer*, Denver, CO, for plaintiff.

*James P. Connor*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, and *Bryant E. Snee*, Acting Director, for defendant.

**ORDER GRANTING GOVERNMENT'S MOTION TO DISMISS ALL SUBCONTRACTOR-RELATED CLAIMS FOR LACK OF JURISDICTION**

**FIRESTONE**, *Judge*.

In this breach of contract case, United States Enrichment Corporation ("plaintiff" or "USEC") alleges that the United States ("the government") breached numerous agreements with plaintiff when the government failed to reimburse certain indirect costs that USEC incurred as both a prime contractor and subcontractor while performing work at the United States Department of Energy's ("DOE" or "the agency") gaseous-diffusion plants ("GDPs") in Portsmouth, Ohio and Paducah, Kentucky.  Plaintiff's claims stem from DOE's purported failure to establish provisional and/or final indirect cost rates in a

timely manner in connection with those prime and subcontracts, which allegedly resulted in USEC being under-compensated throughout performance.  USEC claims that DOE's breaches have resulted in damages to USEC totaling $37,970,480 plus interest under the Contracts Disputes Act, ("CDA"), 41 U.S.C. § 7101, et seq., of which $3,823,289 relates to damages on USEC's subcontracts, which are at issue in this opinion.

The government has moved to dismiss plaintiff's complaint to the extent that it seeks damages related to USEC's alleged under-reimbursement on contracts between plaintiff and other DOE prime contractors.[1]  Specifically, the government contends that the court lacks jurisdiction to entertain a suit brought directly by USEC in its capacity as a subcontractor.  For the reasons explained below, the court **GRANTS** the government's motion.

I. BACKGROUND[2]

a. Agreements Between USEC and DOE

The alleged contract breaches underlying USEC's complaint arise from several agreements between USEC and DOE related to the lease, operation, and maintenance of DOE's GDPs in Portsmouth, Ohio and Paducah, Kentucky.  For the purpose of deciding

---

[1] The government's motion originally also sought to dismiss Counts I and III of the complaint, which related to USEC's provisional billing rates for fiscal year ("FY") 2003 and FY 2004.  On July 25, 2014, the parties filed a joint status report in which they represented that they had reached an agreement to resolve Count I (FY 2003 provisional billing rates), Count III (FY 2004 provisional billing rates), and Count V (FY 2005 provisional billing rates) without further involvement of the court.  Accordingly, this opinion is limited to the issue of USEC's entitlement to recover damages related to its subcontracts with other DOE prime contractors.

[2] The court limits its discussion to those matters necessary to resolve the scope of the government's motion.  The facts discussed herein are derived from the complaint together with matters incorporated by reference or integral to the claim.

the government's motion, these agreements include: (1) a 1993 Memorandum of Agreement ("1993 MOA") providing for services to be exchanged between USEC and DOE;[3] (2) a 2003 Agreement for Services ("2003 Services Agreement"), which described the process by which USEC and DOE would perform services under the 1993 MOA; (3) a 2006 Agreement for Services ("2006 Services Agreement"), which replaced the expiring 2003 Services Agreement; (4) a 2006 Memorandum of Agreement ("2006 MOA Modification"), which modified the 1993 MOA to account for changes to the underlying 1993 lease; and (5) direct contracts between DOE and USEC for various services, including the "Cold Standby/Cold Shut Down Contract."  These agreements are discussed briefly below to provide the necessary context to rule on the government's motion.

　　　USEC and DOE entered into the GDP Lease, effective July 1, 1993, for uranium enrichment facilities at the Portsmouth and Paducah GDPs.  Compl. ¶ 13.  Although the attached 1993 MOA contemplated that USEC and DOE would provide services to each other in connection with the lease, the 1993 MOA did not establish the details for how those services would be provided.  See Compl. ¶¶ 14-15.  Those details were fleshed out in the 2003 and 2006 Service Agreements entered into between USEC and DOE.

　　　The 2003 and 2006 Services Agreements set forth the process by which USEC would perform services for DOE.  Specifically, the agreements stated that USEC's work at the Portsmouth and Paducah plants would be performed pursuant to written "Work

---

[3] The 1993 MOA, which has not been provided to the court, was attached to the Lease Agreement between DOE and USEC for the GDPs at issue in this case.

Authorizations" issued by DOE, which would be payable within a set period of time after invoicing.  Compl. ¶¶ 23-25; Def.'s Mot. Dismiss App. at A3.

In late 2006, USEC and DOE modified the 1993 MOA to account for a change to the 1993 lease.[4]  The 2006 MOA Modification described certain "Captive" services that USEC and DOE would provide at the Portsmouth and Paducah plants, and also indicated that USEC could provide related Captive services to other DOE prime contractors. Article II of the 2006 MOA Modification provided:

> 1. The general purposes of this Services Agreement Modification No. 1 are to enable DOE to provide to USEC certain services at the GDPs and to enable USEC to provide to DOE certain services at the GDPs.  Nothing in this Services Agreement Modification No. 1 shall be interpreted to require either DOE or USEC . . . to furnish any service or services to the other Party in the event service(s) of that type is not necessary for a Party's own programmatic needs or to require either Party to purchase any service(s), captive or otherwise, from the other Party.
>
> 2. For the purposes of obtaining Captive Services as designated on Appendix B of this Services Agreement Modification No. 1, the definition of the Parties shall include any prime contractor or subcontractor performing work on behalf of either DOE or USEC.  An agreement for Captive Services approved in advance by the DOE Lease Administrator between a DOE prime contractor or subcontractor and USEC for work approved after execution of this Services Agreement Modification No. 1 shall be treated as an agreement under the provisions of this Services Agreement Modification No. 1, including, but not limited to, the provisions related to ARTICLE IV A.1, and shall be on a cost reimbursable basis.

Def.'s Mot. Dismiss App. at A19.  The 2006 MOA Modification also stated that,

---

[4] The 2006 MOA Modification left in place the 2006 Services Agreement.  See Def.'s Mot. Dismiss App. at A19 ("Work Authorizations or other implementing agreements previously issued pursuant to the Services Agreement, dated as of July 1, 1993, shall continue to be in effect under the terms of each respective Work Authorization or other implementing agreement, unless and until superseded by a subsequent agreement, contract, or Work Authorization.").

4

consistent with Article II, USEC would perform for DOE (or its contractors or subcontractors) on a cost-reimbursement basis, without fees or profit. Id. at A20, A24-25.

Between 2005 and 2011, USEC and DOE allegedly entered into more than thirty cost-reimbursement Work Authorizations for USEC's work at the Portsmouth and Paducah plants under the 2003 and 2006 Services Agreements. Plaintiff also alleges that throughout the relevant period, USEC provided services to DOE through sixteen subcontracts with other DOE prime contractors using USEC's DOE-approved rates. Because these rates were lower than USEC's anticipated final rates, USEC claims that it was under-reimbursed in connection with these subcontracts in the amount of $3,823,289. See Pl.'s Opp'n 10.

USEC and DOE also entered into several direct contracts, the largest of which was the Cold Standby/Cold Shutdown Contract, which was definitized in 2003. The Cold Standby/Cold Shutdown Contract involved the operation, maintenance, and support of the Portsmouth gaseous-diffusion plant in a "cold standby" status, and included provisions to address billing of indirect costs prior to the establishment of final indirect cost rates. Def.'s Mot. Dismiss App. at A39-40, A45.

### b. Regulatory Background Concerning Billing and Payment Under the DOE-USEC Agreements

Plaintiff alleges that most of its agreements with DOE incorporated FAR 52.216–7 or similar language, which governed how USEC would be reimbursed by DOE. Compl. ¶¶ 52-54. In general, DOE was to provide interim reimbursements to USEC for indirect

costs, payable within 30 days of USEC's submission of an invoice. Id. ¶ 55. These reimbursements were to be based upon billing rates approved by DOE or, in some instances, DOE's auditors. Id.

Under FAR 52.216–7, DOE was required to make interim payments to USEC as work progressed for those costs that the Contracting Officer deemed allowable under the FAR and terms of the contract. FAR 52.216–7(a)(1). Until DOE and USEC established final annual indirect cost rates for a given period, however, reimbursement was to be made "at billing rates established by the Contracting Officer or by an authorized representative . . . subject to adjustment when the final rates are established." FAR 52.216–7(e). These billing rates were to be the "anticipated final rates," and could be "prospectively or retroactively revised by mutual agreement, at either party's request, to prevent substantial overpayment or underpayment." FAR 52.216–7(e)(1)-(2).

FAR 52.216–7(d) establishes a procedure for determining final indirect cost rates. Within six months of the expiration of a given fiscal year, USEC was required to submit its proposed final indirect rates to the Contracting Officer and the government's audit agency, the Defense Contract Audit Agency ("DCAA").[5] FAR 52.216–7(d)(2)(i); Compl. ¶ 106. Any extension of this six-month period was required to be in writing and was only to be granted in "exceptional circumstances." FAR 52.216–7(d)(2)(i). USEC and the government were required to "establish the final indirect cost rates as promptly as practical after receipt of [USEC's] proposal." FAR 52.216–7(d)(2)(ii).

---

[5] USEC has termed its cost rate proposal submissions "incurred cost submissions" ("ICS").

6

Within sixty days after settlement of final indirect cost rates, USEC was required to "update its billings on all contracts to reflect the final settled rates and update the schedule of cumulative direct and indirect costs claimed and billed . . . ." FAR 52.216–7(d)(2)(v). This was to be followed by a written settlement between USEC and DOE that set forth:

> (i) the agreed-upon final annual indirect cost rates, (ii) the bases to which the rates apply, (iii) the periods for which the rates apply, (iv) any specific indirect cost items treated as direct costs in the settlement, and (v) the affected contract and/or subcontract, identifying any with advance agreements or special terms and the applicable rates.

FAR 52.216–7(d)(3). One hundred and twenty days after settlement, USEC was required to submit a completion invoice (or voucher) that reflected the settled amounts and rates, including settled subcontract amounts and rates.[6] FAR 52.216–7(d)(5). At any time or times before final payment, however, DOE had the right to audit USEC's invoices or vouchers and statements of cost. FAR 52.216–7(g).

### c. USEC's Provisional Billing Rates for Fiscal Year 2003

Throughout FY 2003, USEC billed—and DOE reimbursed—USEC's indirect costs based upon the indirect cost billing rates that DOE had most recently approved. For USEC work performed at the GDPs in FY 2003, USEC initially billed DOE based on its FY 2002 approved billing rates, which the DCAA had approved on December 28, 2001. Beginning with USEC's invoice for March 2003, USEC began using revised billing rates

---

[6] The Allowable Cost and Payment Clause specifies that "[t]he prime contractor is responsible for settling subcontractor amounts and rates included in the completion invoice or voucher and providing status of subcontractor audits to the contracting officer upon request." FAR 52.216–7(d)(5).

7

approved by DCAA on March 21, 2003.  On August 27, 2003, USEC notified DOE that its approved revised billing rates were too low and had resulted in significant unbilled costs for work performed in FY 2003.  Compl. ¶ 108.  On January 19, 2004, USEC proposed second revised billing rates for FY 2003.  Compl. ¶ 109.  On May 25, 2004, DCAA approved the second revised billing rates for FY 2003 based on USEC's January 19, 2004 request.  Compl. ¶ 110.  In June 2004, USEC determined that these approved revised rates were still too low and requested third revised billing rates on June 10, 2004.  Comp. ¶ 111; Pl.'s Opp'n 6.  Plaintiff alleges that DOE did not respond to this request until August 25, 2011, when DOE rejected USEC's invoice.  See Pl.'s Opp'n 6, 12.

### d.  USEC's Provisional Billing Rates for Fiscal Year 2004

For USEC work at the GDPs in FY 2004, USEC initially billed DOE based on its FY 2003 billing rates approved by DCAA on March 21, 2003.  USEC subsequently submitted proposed revised billing rates on January 19, 2004, February 18, 2004, and March 26, 2004, none of which received DOE approval.  On April 30, 2004, USEC submitted another revised request for FY 2004 billing rates, making several formatting changes to facilitate a DOE audit and correcting minor mistakes in the March 26, 2004 proposed rates letter.  On June 1, 2004, DOE approved USEC's April 30, 2004 FY 2004 billing rates.  USEC applied these FY 2004 billing rates beginning on May 1, 2004.  By letter dated March 24, 2005, USEC notified DOE that its April 30, 2004 approved billing rates for FY 2004 were significantly lower than USEC's actual incurred costs in FY 2004 and requested that DOE approve revised billing rates so that USEC could prepare adjustment invoices to recover the unbilled costs.  Compl. ¶¶ 145-46.  Plaintiff alleges

8

that DOE did not respond to this request.  See Compl. ¶ 147; Pl.'s Opp'n 12 (claiming that prior to August 25, 2011, DOE never expressly rejected USEC's requests for revised billing rates).

### e. USEC's Certified Claims and DOE's Denial of those Claims

On December 2, 2011, USEC submitted its first certified claim to DOE's Contracting Officer for allegedly unreimbursed indirect costs for the years 2003 through 2009 in the amount of $11,217,504.  Compl. ¶¶ 84-85.  On June 1, 2012, DOE's Contracting Officer issued her final decision and denied USEC's claim in its entirety.  Compl. ¶ 89; Def.'s Mot. Dismiss App. at A256-75.[7]  USEC submitted a second claim on February 16, 2012, demanding payment for breach of contract damages equaling $8,992,660, plus interest, in unreimbursed indirect costs allocable to eleven DOE contracts, plus damages caused under its subcontract agreements during FY 2010.  Def.'s Mot. Dismiss App. at A278.  While the second claim was still pending, plaintiff submitted a third claim, on May 8, 2012, demanding payment for breach of contract equal to $17,760,316 plus interest in unreimbursed indirect costs allocable to a total of

---

[7] The Contracting Officer's decision provided, inter alia:

> USEC was late submitting documents, sporadically submitted revisions, frequently revised submissions, and didn't fulfill its responsibility by responding to DOE's questions regarding these submissions in a timely manner.  Further, despite the complexity of USEC's cost accounting practices, the changing indirect rate models, the number and volume of documents submitted, and the numerous retroactive accounting practice changes proposed by USEC, the DOE has met its obligations under the various contract agreements with USEC.

Def.'s Mot. Dismiss App. at A273.

eleven DOE contracts, plus damages caused under subcontract agreements during FY 2011. DOE denied both claims on August 15, 2012.[8] Compl. ¶¶ 94, 99.

USEC filed its fourteen-count complaint on May 30, 2013. Briefing was complete on December 4, 2014, and oral argument on the government's partial motion to dismiss for lack of jurisdiction was held on April 27, 2014.[9] Following oral argument, the court stayed consideration of the case to allow the parties to discuss settlement.

On July 25, 2014, the parties filed a joint status report in which they indicated that USEC had agreed to dismiss Counts I, III, and V with prejudice. See Joint Status Report, ECF No. 36. The parties indicated that they were unable, however, to reach a resolution concerning the government's requested dismissal of plaintiff's claims relating to costs incurred under USEC's contracts with other DOE contractors. The court now turns to those claims.

---

[8] The Contracting Officer's decision provided, inter alia:

> USEC has claimed numerous costs associated with its subcontracts with various other entities, some of which were DOE prime contractors . . . . With limited exceptions, the CDA does not afford subcontractors the ability to pursue a claim directly against the Government arising out of subcontracts. Those exceptions are not applicable here. Further, DOE is not a party to those subcontracts or otherwise in privity with USEC regarding those agreements. Each of the subcontracts likely contains mechanisms for handling disputes, all of which may be pursued between USEC and the prime contractors with which USEC has an agreement. Consequently, all costs attributable to issues arising under the subcontracts are denied.

Def.'s Mot. Dismiss App. at A284.

[9] As noted, the government's motion originally sought to dismiss USEC's claims related to provisional billing rates in 2003 and 2004, as well as all subcontractor-related claims. See note 1.

**II.    DISCUSSION**

    **a. Standard of Review**

The Tucker Act vests this court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). When proceeding against the government for breach of contract, a plaintiff is generally obligated to demonstrate the existence of a direct contract between the government and the plaintiff. This well-established rule exists because "the government consents to be sued only by those with whom it has privity of contract." Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984). Subcontractors and other third parties are generally not permitted to raise claims directly against the government, and instead "have the option of enforcing their subcontract rights against the prime contractor in appropriate proceedings, or of prosecuting a claim against the government through and in right of the prime contractor's contract, and with the prime contractor's consent and cooperation." Id.; see also E.R. Mitchell Constr. Co. v. Danzig, 175 F.3d 1369, 1370 (Fed. Cir. 1999) (discussing pass-through suits).

The burden of establishing jurisdiction falls on the plaintiff. Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014); Estate of Hage v. United States, 687 F.3d 1281, 1290-91 (Fed. Cir. 2012). Where, as here, the government has moved to dismiss certain claims on jurisdictional grounds, "the factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true." Shoshone

Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1030 (Fed. Cir. 2012). As a result, the court will look beyond the pleadings, if necessary, to inquire into whether jurisdiction exists. See Banks, 741 F.3d at 1277. Indeed, where the court's jurisdiction is challenged on the grounds that plaintiff lacked contractual privity with the government, the court will closely read any contractual documentation to determine whether it possesses authority to proceed. See N. Hartland, L.L.C. v. United States, 78 Fed. Cl. 172, 179-81 (2007), aff'd, 309 F. App'x 389 (Fed. Cir. 2009).

### b. The Court Lacks Jurisdiction to Consider Plaintiff's Claims Stemming from its Contracts with Other DOE Prime Contractors

The government argues that the court lacks jurisdiction to hear claims related to USEC's contracts with other DOE prime contractors on the ground that, as a subcontractor, USEC is not in privity with the government and thus lacks standing to sue the government directly under the Tucker Act or CDA. The government also contends that USEC might not have needed to show privity if it had shown that DOE's prime contractors were merely purchasing agents for DOE, but that USEC elected not to make a claim based on agency.[10]

Plaintiff attempts to avoid dismissal by arguing that its claims stem from its direct contracts with the government. Specifically, plaintiff contends that (1) USEC and DOE entered into direct agreements with each other that "required" USEC to provide services to DOE through other prime contractors, which would be reimbursed at the same rate that

---

[10] Plaintiff neither alleges facts consistent with an agency theory nor responds to the government's arguments in its briefs.

USEC billed DOE directly; or, in the alternative, that (2) USEC is entitled to recover subcontract-related losses as "consequential damages" flowing from plaintiff's direct contracts with DOE, because such damages were the foreseeable consequence of the government's failure to timely approve USEC's billing rates.[11]  The court rejects both arguments for the reasons that follow, and concludes that plaintiff has failed to meet its burden of adequately alleging subject matter jurisdiction as to its subcontractor-related claims.

To begin, plaintiff's assertion that the agreements between the government and USEC "required" USEC to contract with other DOE prime contractors is not supported.[12]  The 2006 MOA Modification states:

> Nothing in this Services Agreement Modification No. 1 shall be interpreted to require either DOE or USEC . . . to furnish any service or services to the other Party in the event service(s) of that type is not necessary for a Party's own programmatic needs or to require either Party to purchase any

---

[11] In a footnote, plaintiff also suggests that the court should relax the privity requirement because of DOE's role in negotiating the terms of USEC's agreements with other DOE prime contractors. See Pl.'s Opp'n 24 n.7 ("DOE should not be permitted to dictate contractual terms of the DOE Subcontract Agreements while at the same time disclaiming any responsibility for abiding by its obligation to ensure proper payment is made under the DOE Subcontract Agreements."). Plaintiff's argument is unavailing.  This court has repeatedly held that the government's close contractual oversight, including drafting the language used in agreements between a prime government contractor and its subcontractors, is insufficient to establish privity between the government and a subcontractor.  See G4S Tech. LLC v. United States, 114 Fed. Cl. 662, 670-73 (2014); O. Ahlborg & Sons, Inc. v. United States, 74 Fed. Cl. 178, 190 (2006).

[12] Plaintiff's complaint alleges numerous legal conclusions concerning the effect of various provisions of these agreements.  See, e.g. Compl. ¶ 22 ("The 2006 [MOA Modification] requires that USEC perform certain services for DOE for other DOE contractors at the GDPs under DOE Subcontract Agreements.") (emphasis added).  The court is not obligated to accept legal conclusions as true for the purpose of deciding the government's motion to dismiss for lack of subject matter jurisdiction.  See Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012).

13

service(s), captive or otherwise, from the other Party.

Def.'s Mot. Dismiss App. at A19.  Given this language disclaiming any requirement to perform services, the court rejects plaintiff's assertion that the 2006 MOA Modification created a link between DOE and USEC that required USEC "to enter into . . . subcontract agreements and DOE [to] approv[e] USEC's provisional billing rates that DOE had to use to recover its costs under these subcontract agreements."  Oral Argument Hr'g Tr. 29 17-24, 3:00 P.M., April 24, 2014.

The court also rejects plaintiff's contention that USEC's subcontracts with other DOE prime contractors were incorporated into USEC's direct contract(s) with the government.  Plaintiff relies on a section of the 2006 MOA Modification for this assertion, which states that

> An agreement for Captive Services approved in advance by the DOE Lease Administrator between a DOE prime contractor or subcontractor and USEC for work approved after execution of [this agreement] <u>shall be treated as an agreement under the provisions of [this agreement,]</u> including, but not limited to, the provisions related to ARTICLE IV A.1, and shall be on a cost reimbursable basis.

Def.'s Mot. Dismiss App. at A19 (emphasis added).  The court concludes that this language, alone, is insufficient to demonstrate privity between the government and USEC as to USEC's subcontracts.  At best, this language might support a finding of jurisdiction based on a theory of agency, but plaintiff has failed to make such an allegation, and the court will not interpret USEC's argument to encompass such a theory.[13]  Rather, because

---

[13] In order to support a direct claim against the government as a subcontractor based on an agency theory, the subcontractor must demonstrate that "[t]he prime contractor was (1) acting as a purchasing agent for the government; (2) the agency relationship between the government and

USEC entered into separate agreements with prime contractors to provide Captive work, those agreements are controlling. To recover additional indirect costs, USEC must comply with the mechanisms set forth in those agreements and applicable regulations. See 48 C.F.R. § 52.216–7(d)(5) ("The completion invoice or voucher shall include settled subcontract amounts and rates. The prime contractor is responsible for settling subcontractor amounts and rates included in the completion invoice or voucher and providing status of subcontractor audits to the [C]ontracting [O]fficer upon request.").[14]

The court also rejects plaintiff's alternative argument that USEC can recover "consequential damages" under its direct contracts with DOE that relate to USEC's subcontracts. The 2003 and 2006 Service Agreements expressly addressed the availability of such damages:

> Each Party's liability to the other Party, to parties related to the other Party, and to third persons arising out of or in connection with this Agreement, shall be governed by the provisions of the Lease Agreement and applicable law.
> . . . .
> Neither Party shall be liable to the other Party for consequential, indirect or special damages, including loss of profit, fee, compensation of any kind or losses, costs or damages due to business interruption, arising out of the activities contemplated by this Agreement.

---

the prime contractor was established by clear contractual consent; and (3) the contract stated that the government would be directly liable to the vendors for the purchase price." Nat'l Leased Hous. Ass'n v. United States, 105 F.3d 1423, 1436 (Fed. Cir. 1997) (quoting United States v. Johnson Controls, Inc. v. United States, 713 F.2d 1541, 1551 (Fed. Cir. 1993)).

[14] At oral argument, plaintiff was unable to explain why this procedure would not provide it with the relief it seeks with regard to its subcontract-related claims.

Def.'s Mot. Dismiss App. at A6 (emphasis added).  Plaintiff has not provided any evidence or argument that would alter the court's conclusion that this language unambiguously disclaims the right of either USEC or the government to recover consequential damages stemming from agreements associated with work at the GDPs.

### III.    CONCLUSION

For the foregoing reasons, the court finds that it lacks jurisdiction to hear plaintiff's request for relief stemming from its subcontract agreements with other DOE prime contractors.  Therefore, the government's Partial Motion to Dismiss is **GRANTED**.  The parties shall file a status report no later than **August 7, 2014**, to propose a discovery and briefing schedule to address the remaining claims.

**IT IS SO ORDERED.**

s/Nancy B. Firestone  
NANCY B. FIRESTONE  
Judge

16